## DENIS CRONAN *v.* SAMUEL J. PETERS et al.

Defendant, an officer of Government, by an erroneous construction of plaintiff's contract with the Government, prevented its performance, and thus deprived plaintiff of advantages resulting from it. The Government ratified the construction which defendant placed upon the contract. *Held:* That the contract was a public one, in which defendant had no personal interest, and which was not obligatory upon him, and that he could not be held liable for an erroneous interpretation of it which the Government ratified.

APPEAL from the Second District Court of New Orleans, *Lea,* J.

*G. B. Duncan,* for plaintiff and appellant:

Good faith, saith Lord Mansfield, in the "Swartwout case," 4 Bur. 1986, is not alone sufficient to protect the agent against personal liability. He puts the two cases as exceptions to the general rule.

1st. Where the agent is under timely notice. 2d. Where the agent has acted *mala fide*. This limitation of the general rule was also approved by the Supreme Court of the United States, 10 Peters, 156.

See, also, *Hearsey* v. *Pruyn,* 7 John., 182–3 ; *Cary* v. *Webster,* 4 Stra., 480 ; *Adams* v. *Hopkins,* 5 John., 255, N. 1 ; *Riplay et al* v. *Gelston,* 9 John ; *Fry* v. *Lockwood,* 4 Cowen, 456 ; *Osborn* v. *the Bank of the United States,* 9 Wheaton, p. 368, *et seq.*

The true, rational, and constitutional doctrine in such cases, is laid down by Justice McLean, as the organ of the undivided Court, in the case of *Tracy & Balestier* v. *Swartwout,* 10 P., 93–9. The case was this : The plaintiffs were importing merchants, had imported, at New York, a quantity of syrup of sugar cane. The defendant was Collector of the port. It was admitted that the lawful duties on the article was 15 per cent. *ad valorem.* The Collector demanded a bond for said duty, or, should it be required, of three cents per pound. This he did under positive instruction from the Secretary of the Treasury. The plaintiffs refuse ; the goods remained in possession of the Government, and were deteriorated. The plaintiff admitted that the defendant acted throughout in entire good faith, and under instructions from the Secretary of the Treasury.

The case was tried in the Circuit Court, and the Court instructed the jury that the amount offered by plaintiffs was all the duty the Government was entitled to, yet the circumstances ought to subject the defendant to only nominal damages, that the Collector was pursuing what he believed the true construction of the law. The jury, under this instruction, found for plaintiffs six cents damages, to wit: nominal damages.

The case came up before the Supreme Court, and on the foregoing instructions of the Circuit Court, they say,

"The Collector of the Customs is a ministerial officer; he acts under instructions of the Secretary of the Treasury. * * *

"Do these instructions, when not given in accordance with law, afford a justification to the Collector, or exonerate him from the payment of adequate damages for an injury resulting from his illegal acts. The Circuit Court did not consider these instructions as a justification to the defendant; and in this they were unquestionably correct."

"The Secretary of the Treasury is bound by law" * * * Neither he nor those who act under him, can dispense with, or alter any of its provisions. It would be a most dangerous principle to establish, that the acts of a ministerial officer, when done in good faith, however injurious to private rights, and unsupported by law, should afford no ground for legal redress."

This, if the Court please, is doctrine and language worthy of an American Jurist, administering American law in a country where, thanks be to God, and the Continental Congress, none are so high as to be above the reach of the law, and none so low but that they may feel that they are safe under its protecting power. Such sentiments are not unworthy of a Denman, who as Lord Chief Justice of England, in the case of *Stockdale* v. *Hansard*, 9 A. & E. 1, declared that the British House of Commons, "cannot alter the law, or by resolution place any one beyond its control. The proposition is wholly untenable, and abhorrent to the first principle of the Constitution of England."

It was a case where a printer, being sued for a libel, put forth the plea that he was the printer of the House of Commons—that he had printed only by its order. The House itself adopted the act, and instructed the Attorney General of England to appear—intervene in the case—take the whole defence and plead, as a peremptory exception, that the House having done the act was privileged from suit and irresponsible. The Judge says again, E. C. 36, p. 65., "When one of my fellow subjects presents himself before me in this Court, demanding justice for an injury, it is not at my option to grant or withhold redress; I am bound to afford it, if the law declares him entitled to it." That whole opinion may be read and studied by every friend of untrammeled law; of constitutional liberty; of freedom in courts of justice; of historical truth; of eloquent defence of the independence of the judiciary; of a noble assertion of that better rule which upholds the rights of private citizens against the power of the government.

I revert once more to the case of *Tracy*. At page 95, the court says distinctly, "Where a ministerial officer acts in good faith, for an injury done he is not liable to exemplary damages; but he can claim no further exemption, where his acts are clearly against the law."

I plant myself upon the great truths here vindicated. They cannot be overthrown; and until they are, the case at bar is with the plaintiff. When this Court shall cut itself loose from the law, and with something worse than judicial blindness echo back what was said of this case in the court below, as seen in the printed opinion, then indeed will the plaintiff lose his case on this question of law, but not until then, and I trust that day may never come.

At page 97 the court again says that the "plaintiff having failed to give an illegal bond was not a circumstance which should have lessened the plaintiffs' damages; nor in point of law, should the good faith in which the defendant seems to have acted, exempt him from compensatory damages." "Some personal inconvenience may be experienced by an officer who shall be held responsible in damages for illegal acts done under instructions of a superior; but as the Government in such cases is bound to indemnify the officer there can be no eventual hardship" 10 P. 98–9, 13 Peters 176–7 (Thompson.)

An officer entrusted by the Common or Statute Law, is liable to an action for negligence in the performance of his trust or duty, or for neglect in the execution of his office. *Jenner* v. *Joliffe*, 9 John., 381.

It is a general principal of law that whenever an individual has sustained an injury, by the misfeasance or nonfeasance of an officer, who acts or omits to act, contrary to his duty, the law affords redress by an action on the case adapted to the injury. 15 John., 254.

It is no objection to the action that it is new, if it be not new in principle. 4 Burr., 2345; 5 Burr., 2709–21.

In an action on the case for nonfeasance if the declaration avers *vi et armis*, it is bad. And generally now in this action it is omitted. '1 Comyn., 277, c. 3.

It is clear from the authorities that money may be recovered from a public officer, though paid to him in the official capacity—and though he may have been acting in the most perfect good faith, and under instructions from his official superiors,—if he received it against law and right. Story on Agency, sec. 300, 307. There is no difference in principle between an officer exacting money from a citizen without law, and refusing to give him that which belongs to him, contrary to law.

In the case of *Walker* v. *Swartwout*, 12 John., 447, Chief Justice Thompson lays down the law to be, that an officer must not only make his official position known but he must furnish the proper vouchers to the party to enable him to recover from Government, and if he fails to do so he is personally responsible. It is true that a majority of the Court was against the Chief Justice, but not on this legal point,—only on the facts. See *Ripley* v. *Gelston*, 9 John. 208–9.

*Hunton & Bradford*, for defendant :

For misfeasances and nonfeasances in office, certain officers have sometimes been held responsible personally for injuries resulting therefrom to individuals. The correctness of the principle of law upon which such responsibility was enforced is not questioned. But that principle is not at all applicable in a case like the present. In offices in which the incumbent owes a duty and is under an obligation to the public at large as well as to the government which appoints him, this personal responsibility for misfeasances and negligences is acknowledged.

A postmaster, for example, is under an obligation, by virtue of his office to deliver the letters which come to his office, to the persons legally entitled to receive them, and should he wilfully refuse to deliver such letters, he would for such a misfeasance, be personally responsible to the party injured. So, too, a collector of the customs, by virtue of his office, is under an obligation to receive entries of merchandise, etc., and this duty he owes to the public, to every individual importer, and should he be guilty of any negligence of his prescribed duty, would render himself personally liable to any one injured thereby. But no case has been cited by plaintiff's counsel, and no case can be found where this principle has been extended to contracts made with the government through its agents.

"An agent contracting on behalf of the Government, is not personally bound by such a contract even though he would be by the terms of the contract if it were an agency of a private nature," p. 382, lec. 302, *et seq.*

This rule has often been recognized and enforced by the courts of England and the United States.

In the case of *Stokes* v. *Kendall*, 3 How., p. 88–9, *Stokes* sued *Kendall*—then P. M. General—alleging that plaintiffs had certain contracts with *Barry*, *Kendall's* predecessor, for carrying the mails; that by virtue of said contracts they became entitled to certain credits which *Barry* caused to be entered in their favor on the Books of the Department. That defendant, as *Barry's* successor, disallowed said credits, and charged plaintiffs on his books, the sum of $122,000. That subsequently, by a special law of Congress, the accounts between plaintiffs and the P. O. Department were referred to an auditor, and by said law *Kendall* was directed to enter upon his book such credits as the auditor might award. This *Kendall* refused to do. On the trial, the jury, under instructions, found a verdict for plaintiffs for $11,000 damages, sustained as they said, in consequence of the illegal acts of the defendant.

Now here was a case by which the public officer was, by a special law of Congress, directed to allow certain credits in fulfilment of a contract. He refused to do so, and by his refusal the plaintiffs sustained damages. But was the defendant personally liable? The Supreme Court held the contrary ; and C. J. Taney, in delivering the opinion of the court, used this language : "A public officer is not liable to an action if he falls into an error, in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion, even though an individual may suffer by his mistake."

*Peters* certainly stands in a more favorable attitude to escape personal liability than *Kendall* did, in the case cited. There, *Kendall* was directed by law to do a certain thing which he refused to do ; here, the commissioners not only

had no instructions as to the execution of the contract with *Cronan*, but all they did in reference to that contract—the very acts now complained of, have been sanctioned and approved by the commissioners of customs at Washington, and the commissioners have been instructed not to pay.

In a very recent case in the Supreme Court, Justice Grier says, "it is an established rule of law that an agent who contracts in the name of his principal is not liable to a suit on such contract, much less a public officer acting for his Government. As regards him, the rule is, that he is not responsible on any contract he may make in that capacity." *Parks* v. *Ross*, 11 How., 374.

To the same effect are the following authorities: 12 Johnson, 444; 2 Wend., 375; *Brown* v. *Austin*, 1 Mass., 214; *Dawns* v. *Jackson*, 9 Mass., 490; 4 Humph., 303.

In the several cases referred to by the learned counsel for the plaintiff, nothing can be found in conflict with these plain principles of law. The questions adjudicated in the case of *Osborne* v. *the Bank of the United States*, did not approximate the principles involved here.

The case of *Elliot* v. *Swartwout* was not a case for breach of contract, but was brought against a ministerial officer for demanding duties beyond what he was by law authorized to exact, and for his refusal to deliver goods until those illegal duties were paid. In that case the plaintiff paid the excessive duties in order to get possession of his goods, paid under protest, and sued to recover them back. Appellant's counsel has fallen into an error in stating, that in that case the plaintiff voluntarily submitted to the views of the law entertained by the officer, and paid over the money. On the contrary, it was expressly held that even a collector, a ministerial officer, with prescribed duties, would not be responsible in an action to recover back duties illegally exacted, and paid by him into the treasury, unless these duties were paid under protest. And in his comment on that case the counsel errs again in saying that it cannot be insisted upon, here, that the officer has paid over the money to the government. This *Peters* has been compelled to do.

In the case of *Walker* v. *Swartwout* it was expressly decided that a public agent employing a man to work on account of government, in his known official capacity, is not responsible, personally, for the wages. It is true that Thompson, C. J., dissented, but only on the ground that the defendant had made himself liable by an express individual promise to pay, and by his refusal to give the laborer any certificate or voucher which would enable him to obtain his wages from the government.

After an attentive examination of the cases cited by plaintiff's counsel we have failed to find a single one, in which an agent contracting on behalf of an avowed principal, has been held personally responsible for the breach of such a contract.

The cases cited, of suits against officers for official misconduct, for violating rights of parties fixed by law, are not analagous to the one before the court. In the language of the District Judge, "the case at bar involves the construction of a contract with the government and the defendant cannot be made responsible for a breach of that in consequence of acts done in good faith, in the exercise of a sound discretion, and within the limits of his official function."

If the United States have failed to cause the contract entered into by them, to be faithfully executed, they are bound to indemnify *Cronan* for any damage he may have sustained by the inexecution of the contract. In the words of a distinguished jurist " the presumption is that the government is ready to fulfill all its contracts, and discharge its obligations, not only with good faith but punctilious promptitude, and in a spirit of liberal courtesy."

If the principal contended for by the counsel for appellant should be recognised and established as law, the consequences would be most pernicious to the public interests. No public agent or officer will look to the interests of the government and undertake to have its contracts fairly executed, if from an error of judgment in construing the rights of the parties to such contracts, he is to be held personally responsible. No man, indeed, would accept an office or agency under the government, requiring his aid or services in receiving supplies, making disbursements, or aiding otherwise in the execution of government contracts, if he is to be held personally liable for any and every infringement of what may be adjudged to be the legal rights of the parties to such contract.

This is not and never has been the rule of law.

In making his contract the plaintiff gave credit to the government, as fully appears from the terms of the instrument. He looked to the government, and not to its agents, the commissioners, for the fulfilment of the contract, and for the pay to which he might become entitled under it. If he has any claim for damages for breach of the contract, it must be preferred against the party with whom he contracted.

OGDEN, J. The Government of the United States, on the 16th of November, 1848, entered into a contract with the plaintiff for the hauling of the materials necessary to the building of the customhouse in New Orleans. The contract was executed on the part of the Government by *Denis Prieur, Alcée Labranche and William M. Gwin*, in the capacity of Commissioners on behalf of the United States, and was approved by the Secretary of the Treasury. These Commissioners were appointed by the Secretary of the Treasury under power vested in him by law. The following facts are material for the proper understanding of the respective rights and obligations of the parties:

"That, whereas, in compliance with the acceptance on the part of said parties of the second part, of the proposal made by said party, if the said party of the first part, of the 30th October, 1848, to do all the hauling of the materials necessary to the building of said customhouse, said party of the first part doth hereby covenant and bind himself to and with said party of the second part, to do all the hauling of the building materials which may be deemed necessary for the erection of said customhouse, at the same rates and agreeably with the tariff established by the general council of the city of New Orleans, on the 5th June, A. D., 1843, in such cases, said party of the first part binding himself to do and perform said hauling when thereto required, without prejudice to the progress of the work on said building, and at all times and at such places as may be designated by the superintendent of said building or by the architect thereof, to have and deliver said materials; and in case said party of the first part fail in any respect to do and perform said hauling when thereto required, and in the manner hereinafter stated, then said party of the second part shall have the right to go out and employ others to do said hauling, and said party of the first part by such failure or neglect shall forfeit to said party of the second part the difference, if any, in price, which said party of the second part may have paid by reason of such default; and said party of the first part, as well as his surety in the bond to be given by him, given for the faithful performance of the stipulations of this contract, shall forfeit and be responsible to said party of the second part for such damages as may have been incurred in the progress of the work on said building, by reason of the default of said party of the first part in furnishing and delivering the materials when required; and said party of the first part doth hereby covenant and bind himself to and with said party of the second part,

"1st. To haul all the building materials, including the granite, and to deliver the same when thereto required, at such points as may be designated by the superintendant or architect of said building, in good order and free from all injury from hauling or otherwise, the granite to be delivered free from breakage, or being soiled in its transmission from the Levee to the site of the building, and the said parties of the second part acting in their capacity aforesaid, do hereby covenant and bind themselves to and with said party of the first part, to pay unto said party of the first part, the same rate and amount per load for hauling said building materials as are established by the ordinance aforesaid,

and now in force in this city upon such subjects; except, however, as to the granite, said party of the second part agree and bind themselves to pay unto said party of the first part, the same amount and rate per load as paid by the Second Municipality of the city of New Orleans, for hauling the granite necessary for the new Municipal Hall, said rates, however, to be increased or diminished in proportion to the extra distance over which the granite shall or may be hauled for the customhouse, when compared with the distance over which the granite for the new Municipal Hall has been hauled. Said payment to be made by said parties of the second part on the delivery of said building materials in accordance with the stipulations of this contract, or at such times as the contracting parties may agree upon hereafter.

"Now, it is expressly understood by these presents, that the foregoing contract and all the stipulations therein contained are subject to the approval of the Secretary of the Treasury of the United States, and binding only in the event of his approval. And it is further understood, by and between the parties here contracting, that the payments to be made, said parties of the first part shall depend only upon the appropriations made by Congress, from time to time, for the completion of said customhouse."

By the contract, the plaintiff bound himself in a penal sum, with security, to do all the hauling of the building materials, when thereto required, at the rates established by the tariff adopted by the City Council in 1843, and it was stipulated that on his default at any time, the Government might employ others to do the hauling, and hold him and his security liable for any difference in the price of hauling they should have to pay.

The Commissioners, by whom this contract was made, were succeeded in office by *S. J. Peters, J. W. Crockett* and *W. Turnbull*, against whom this action is brought to recover from them *in solido* $9050 as damages alleged to have been sustained by the plaintiff, up to the time of filing the petition, by reason of the wrongful act of defendants in depriving the petitioner of a profit of that amount, which he would have realized from his contract if the Commissioners had not contracted with other parties for the hauling of materials, in violation of the petitioner's rights under said contract to do all the hauling of the materials necessary for the construction of the customhouse. It appears that some time before the contract was entered into with the plaintiff, the Government had made a contract, through the agency of the same Commissioners, with Kendall & Co. to furnish the Government a large quantity of bricks, and that on default of those contractors furnishing the bricks as required, it was stipulated the Government should have the right to purchase bricks from any other persons and hold the contractors responsible for any difference in price they might have to pay. These contractors having made default, the defendants, acting as Commissioners, made contracts with other parties for the purchase of bricks, and included in the contracts that made the hauling of the bricks to the customhouse; whereas, by their contract with Kendall & Co. the bricks were deliverable at the levee, from which place the plaintiff, under his contract, was entitled to have the hauling. It is for the hauling of these materials, for which it appears by the evidence, the plaintiff would have been entitled, if he had done the hauling, to charge $6563 95, that a recovery is sought to be had from the defendants, in the shape of damages for their illegal act in making contracts with other parties for the delivery of bricks at the customhouse. The suit is prosecuted against defendant, *Peters*, alone, the other defendants not having

CRONAN
v.
PETERS.

been served with process, and it is averred that *Peters* especially, of his own illegal and personal acts, and without the sanction of the Government, pre- vented the plaintiff from doing the hauling, by inducing certain persons to agree with the Commissioners to sell them bricks deliverable at the customhouse, including the hauling. It is averred in the petition that defendant became the disbursing agent of the Government in the matter of their contract with the petitioner, and that he had violated the rights of the plaintiff in the several par- ticulars as before stated.

On the 21st of June, 1851, a letter was written by the Commissioners to the Secretary of the Treasury, informing him that the plaintiff complained of these acts as being in violation of his rights, and claimed to be paid the contract prices for the hauling thus done by others, and requesting instructions on the subject. In this letter they state that when they were compelled to purchase bricks from others, they found they could only get them at a reasonable price by allowing the persons from whom they were purchased, the benefit of contracting to de- liver them at the site of the building, and that it is the universal custom to buy such bricks delivered. They further state that, although the plaintiff insisted that by a proper construction of his contract, he was entitled to all the haul- ing, under all circumstances, they, the Commissioners, thought a reasonable construction of the contract was, that they should give the plaintiff all the haul- ing of materials required and purchased under ordinary circumstances. To this letter the Commissioner of Customs at Washington, to whose department the letter was referred, replies of date July 11th, 1851, approving the construction the Commissioners had placed on the contract, and instructing them not to pay the plaintiff. A subsequent letter from the Commissioners, which bears date the 30th June 1852, after this suit was brought, is also in evidence, in which they ask for more explicit instructions on the subject. In this letter they state that they conceive it to be their duty, in making purchases, to obtain all articles on the most favorable terms; yet, in so doing, their action is necessarily con- trolled by existing contracts, so that no wrong be done to a contractor. That in making their recent contract with Mr. *Blanc* for press bricks, his proposition was for $18 50 per thousand, delivered at the Basin, and $20 per thousand, de- livered at the customhouse; that as *Cronan's* price, according to the contract, for hauling was about $2 25 per thousand, it was obviously the interest of the Government to accept the latter price delivered at the building, and it was ac- cepted, but that *Cronan* considered it to be an evasion of the contract with him, and with some apparent reason. They express in this letter the desire to avoid any act that may have the semblance of an attempt to evade the contract with the plaintiff, and say that if, in the opinion of the Secretary, Mr. *Blanc's* first proposition should have been accepted, there would be no difficulty in altering the contract with him. To this letter no answer from the Secretary is exhi- bited.

On this state of facts we will first enquire whether the contract with the plaintiff was violated. He had bound himself, under a stipulated penalty, to do all the hauling at certain fixed rates, and was consequently under the obliga- tion of being always ready with the requisite teams and laborers. This obliga- tion produced a co-relative right on his part to have the benefit to be derived from the employment of his teams in doing all the hauling, and as it is evident that the hauling, subject to the qualification in said article stated, which he complains was given to others, not from necessity, but for the advant-

age of the Government in procuring the hauling to be done at cheaper rates than they would have had to pay him, we think it was a clear violation of the contract, for which the Government is responsible in damages to the plaintiff. As to what would be the measure of those damages, if the Government could be sued, and was a party to the record, the rule is furnished in Art. 1928 of the Civil Code. It would be the amount of the loss the plaintiff has sustained and the profit of which he has been deprived. It was one of those obligations, which, from its nature, resolves itself into a claim for damages on the inexecution of the contract by either party, and the prices which the plaintiff would have been entitled to charge, if he had done the hauling, would not be a standard by which those damages could be estimated without other proof in connection, showing either an actual loss or privation of gain. But the defendant is charged with a violation of his duty as a public officer, from which, loss, it is said, resulted to the plaintiff, and that he has therefore rendered himself liable for damages as for a tort, and that in such a case proof of the specific damages is not requisite.

The appellee's counsel do not appear to have considered the case as an action for damages, arising *ex contractu*, which, it is clear, could not be maintained without any personal promise or undertaking on the part of the defendant, and the question to be decided is, whether an agent or officer of the Government can be held liable for damages *ex delicto*, by his failing to execute a contract which his principal had made, in accordance with the just rights of the party contracting with his principal, although the principal ratifies and adopts his acts.

If the plaintiff had actually done the hauling, and the defendant, as disbursing agent, had received the money to which the plaintiff was entitled under his contract, the refusal of the defendant to pay it over to him, might have been a violation of his duty as a public officer, rendering him personally liable; but as the hauling was not done, and the claim is one for damages, depending on the proper construction to be given to the contract, the true and proper character of the action would seem to be one for the breach of a covenant. The defendant, if personally liable, could only be condemned on proof of actual breach of the contract, according to its true legal interpretation, and of actual loss and damage sustained by the plaintiff; and those two questions could only be properly determined in an action to which the principal himself was a party. The difficulty that the Government cannot be sued, furnishes no ground for holding the defendant personally liable in such an action, which, from its nature, we can view in no other light than one involving a question of damages for an alleged breach of contract. The contract was a public one; the defendant had no personal interest in it, and as the contract itself was not obligatory upon him, he could not be held liable for the consequences of a violation of it, by the erroneous interpretation of it, which the Government ratified. The ratification was equivalent to an original authority on the principle, "*omnis rati habitio mandato aquiparator.*" Livermore on Agency, vol. 1, 44. The duty which the defendant had to perform in superintending the execution of contracts made by previous agents of the Government, and making such new contracts as might become necessary, was not merely ministerial but required the exercise of discretion and judgment, and in such a case an officer cannot be held personally liable. *Stokes* v. *Kendall*, 3 Howard R., 88.

The case of *Elliot* v. *Swartwout*, 10 Peters, 136, has been relied on in support of this action. In that case the Collector of Customs was held liable for

damages for his wrongful act in seizing the goods of certain importing merchants for duties which by law he had no right to exact. The principle there settled was, that where money is illegally demanded and received by an agent, he cannot exonerate himself from personal responsibility by paying it over to his principal, when he has had notice not to pay it over. If the plaintiff had performed the services, for which, under his contract, he was entitled to be paid, the case cited would go far to sustain an action against the defendant; but the principle involved in the present action is altogether different.

We find nothing decided in the case of *Osborne* v. *the Bank of the United States*, 9 Wheat. 738, which can by analogy sustain the present action. In that case the Treasurer of the State of Ohio was held personally liable, not because the State was exempt from being sued, but on the ground that he was in possession of, and kept as a separate and distinct fund, money which had been taken from the vaults of the United States Bank, in levying a tax on the Bank under a law of the State of Ohio, which was held to be repugnant to the Constitution of the United States and therefore void.

We have not been referred to any authority which we think can support the plaintiff's action, and agree with the conclusion of the court below that the case ought to be dismissed.

Judgment of the court below is therefore affirmed, with costs.

BUCHANAN, J. I concur in the affirmation of this judgment, on the ground that plaintiff has failed to make out, by proof, the case stated in his petition. Had his allegations been sustained by the proof, there was a case of personal liability, under our law. C. C., 2294. And the District Judge properly overruled the exception of no cause of action, pleaded *in limine*. But the proof adduced negatived the allegations of the petition, which, to my view, gave a right of action against the defendant personally. Those allegations are, substantially, that Mr. *Peters*, of his own volition, and without the countenance or authority of Government, took advantage of his situation as Commissioner for the erection of the customhouse in New Orleans, to deprive plaintiff of the hauling of materials, to which, under his contract with Government, he was entitled, and thereby caused great pecuniary loss to plaintiff.

The evidence was, on the contrary, that the contracts with other persons than the plaintiff for hauling of materials were made by another Commissioner than Mr. *Peters*, to wit: by the salaried and managing Commissioner, Mr. *Crockett*, and that the plaintiff declared that he would get along well enough if he had no more trouble with the other Commissioners than he had with Mr. *Peters*.

Under these circumstances, the defendant was entitled to judgment upon the merits.